EQUINOX MILL, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 22706. Promulgated January 31, 1951.

*William Shelmerdine, Jr., Esq.,* and *Arthur E. Whittemore, Esq.,* for the petitioner.

*Paul P. Lipton, Esq.,* and *James R. McGowan, Esq.,* for the respondent.

#### OPINION.

RAUM, *Judge:* The Commissioner determined a deficiency in petitioner's excess profits taxes for the year 1942 in the amount of

$67,047.31, of which $54,243.35 is now in controversy. The sole question for decision is whether the respondent erred in including in the taxable income of petitioner for the year 1942, a refund of $75,338 received by it in 1947 pursuant to a claim filed by it under "(i) (3)" of the Renegotiation Act, as amended.[1]

The facts have been stipulated and are so found. Petitioner, a corporation engaged primarily in the manufacture of cotton textiles, filed its income and excess profits tax returns for the calendar year 1942 with the collector of internal revenue at Boston, Massachusetts. At all times material, petitioner kept its books and filed its returns on the accrual basis.

During 1942 petitioner was engaged in the performance of contracts subject to renegotiation by the War Department under the Renegotiation Act. It was later determined that petitioner realized excessive profits during the calendar year 1942 under such contracts to the extent of $260,000, and an agreement dated August 12, 1943, was entered into between petitioner and the United States whereby petitioner undertook to restore that amount, less the excess profits taxes attributable thereto in accordance with Section 3806 of the Internal Revenue Code.[2]

Petitioner's excess profits tax return for 1942 disclosed a liability in the amount of $461,434.07, which it had paid. Of that amount,

---

[1] Since the entire Renegotiation Act is contained in Section 403 of the Sixth Supplemental National Defense Appropriation Act, 1942, as amended, its various component parts are identified as subsections of Section 403.

[2] SEC. 3806. MITIGATION OF EFFECT OF RENEGOTIATION OF WAR CONTRACTS OR DISALLOWANCE OF REIMBURSEMENT.

(a) REDUCTION FOR PRIOR TAXABLE YEAR.—

(1) EXCESSIVE PROFITS ELIMINATED FOR PRIOR TAXABLE YEAR.—In the case of a contract with the United States or any agency thereof, or any subcontract thereunder, which is made by the taxpayer, if a renegotiation is made in respect of such contract or subcontract and an amount of excessive profits received or accrued under such contract or subcontract for a taxable year (hereinafter referred to as "prior taxable year") is eliminated and, in a taxable year ending after December 31, 1941, the taxpayer is required to pay or repay to the United States or any agency thereof the amount of excessive profits eliminated or the amount of excessive profits eliminated is applied as an offset against other amounts due the taxpayer, the part of the contract or subcontract price which was received or was accrued for the prior taxable year shall be reduced by the amount of excessive profits eliminated; * * *

* * * * * * *

(3) DEDUCTION DISALLOWED.—The amount of the payment, repayment, or offset described in paragraph (1) * * * shall not constitute a deduction for the year in which paid or incurred.

* * * * * * *

(b) CREDIT AGAINST REPAYMENT ON ACCOUNT OF RENEGOTIATION OR ALLOWANCE.—

(1) GENERAL RULE.—There shall be credited against the amount of excessive profits eliminated the amount by which the tax for the prior taxable year under Chapter 1, Chapter 2A, Chapter 2B, Chapter 2D, and Chapter 2E, is decreased by reason of the application of paragraph (1) of subsection (a); · * * *

$188,273.56 was determined to be attributable to the $260,000 in excessive profits. In 1943, pursuant to Section 3806 (b) (1) of the Code, petitioner paid the difference of $71,726.44 to the United States. Subsequently, on February 25, 1944, the Revenue Act of 1943 became law, and section 701 of that Act amended the Renegotiation Act in various respects. Among the amendments was a new provision, referred to as "(i) (3)," which provided in substance that there be excluded from a contractor's "excessive profits" that portion of the profits attributable to certain inventory values ("the increment in value of the excess inventory"). Furthermore, the new (i) (3) explicitly dealt with prior years as follows:

In the case of a renegotiation with respect to a fiscal year ending prior to July 1, 1943, the portion of the profits, derived from contracts with the Departments and subcontracts, attributable to the increment in value of the excess inventory shall (to the extent such portion does not exceed the excessive profits determined) be credited or refunded to the contractor or subcontractor, and in case the determination of excessive profits was made prior to the date of the enactment of the Revenue Act of 1943, such credit or refund shall be made notwithstanding such determination is embodied in an agreement with the contractor or subcontractor, but in either case such credit or refund shall be made only if the contractor or subcontractor, within ninety days after the date of the enactment of the Revenue Act of 1943, files a claim therefor with the Secretary concerned.

By letter to the Secretary of War dated May 5, 1944, petitioner made a tentative claim for refund in the amount of $72,000, pursuant to the foregoing amendment. In August 1946 it submitted a detailed claim in the amount of $92,909.86, and after negotiations with the War Department, it amended and perfected its claim further in October 1946. Under date of December 10, 1946, petitioner was advised that its claim would be recommended to the War Contracts Price Adjustment Board for approval in the amount of $75,338, and that it would thereafter be submitted to the Undersecretary of War for his approval and to the War Contracts Board for certification to the Treasury Department for payment. On or about March 17, 1947, petitioner received a refund in the amount of $75,338, without interest, on account of its claim and it reported that amount as income for that year.[3]

By successive consents executed by petitioner and the respondent, the period within which excess profits taxes for 1942 might be assessed was ultimately extended to June 30, 1949, with the result that the present proceeding, initiated by the Commissioner's determination of February 4, 1949, is timely.

---

[3] In 1947, petitioner with the consent of the Commissioner, changed its accounting period from the calendar year to a fiscal year ending on the last day of August, and the $75,338 was included in its income for the taxable year ending August 31, 1947.

Petitioner contends that the $75,338 refund which it received in 1947 cannot furnish the basis for a deficiency in its 1942 taxes. It relies upon the well known principle that income taxes are assessed annually (cf. *Burnet* v. *Sanford & Brooks Co.*, 282 U. S. 359), and, pointing out that it is on the accrual basis, it contends that the $75,338 item could not possibly be attributed to it for 1942 since it was not until February 25, 1944, that the basis for asserting the claim came into existence, and even then its rights were contingent upon the issuance of regulations, the filing of a proper claim and its final approval. Until these conditions had been satisfied, continues petitioner, its claim was wholly contingent and therefore the income may be accrued only in the later year of approval and payment of the claim, 1947. Cf. *Dixie Pine Products Co.* v. *Commissioner*, 320 U. S. 516; *Security Flour Mills Co.* v. *Commissioner*, 321 U. S. 281; *Freihofer Baking Co.* v. *Commissioner* (CA-3), 151 Fed. (2d) 383; *H. O. Boehme, Inc.*, 15 T. C. 247.

The Commissioner does not dispute petitioner's position if the question were one of general tax law, but he contends that "the 'annual' accounting system does not apply to the renegotiation context," that section 3806 of the Code reflects a legislative intention that adjustments in a taxpayer's excessive profits for a particular year shall be given effect tax-wise in its excess profits taxes for that year, regardless of when such adjustments are made. He points out that under section 3806 (a) (1), excessive profits to be repaid the United States by a contractor whose contract has been renegotiated must be eliminated from the taxable income of the prior year involved, and that section 3806 (a) (3), in providing that the amount of repayment shall not constitute a deduction for the year in which it was paid or incurred, further emphasizes the necessity of relating back to the prior year the tax effect of a renegotiation in a later year.

The difficulty with the Commissioner's position is that although section 3806 requires the reduction of a contractor's excess profits taxes for an earlier year by reason of repayment of "excessive profits" through renegotiation, it contains nothing which authorizes an upward revision of the taxes for the earlier year in the event that such excessive profits are restored to the contractor in a still later year. Indeed, the very same legislation that gave petitioner its right to the refund also authorized refunds of renegotiated excessive profits allocable to a certain additional allowance for amortization of emergency facilities, and provided in substance that the gross amount repayable to the contractor must be reduced by that portion of the excess profits taxes for the earlier year attributable to the gross amount refundable. These provisions were added to the Renegotiation Act by Section 701

of the Revenue Act of 1943, and became "(a) (4) (D)" of the Renegotiation Act [4] at the same time that (i) (3), here involved, also became part of the Renegotiation Act.

In effect, respondent is seeking to achieve herein through section 3806 the same result with respect to (i) (3) refunds that Congress has specifically required in connection with (a) (4) (D) refunds. Whether the failure of Congress to make similar provision for (i) (3) refunds was due to inadvertence or design, we do not know. We have been referred to nothing in the legislative history that is illuminating in this respect. The fact is, however, that although Congress has explicitly taken into account the excess profits taxes of the earlier year in connection with (a) (4) (D) refunds, it in no way dealt with the excess profits taxes that might be allocated to (i) (3) refunds. In view of the great particularity with which this legislation was drawn, we do not feel at liberty to attribute to Congress an unexpressed intention with respect to (i) (3) refunds that was simultaneously spelled out in detail with respect to cognate refunds authorized by (a) (4) (D).

Respondent argues, however, that although Congress could have provided similar machinery for reducing the (i) (3) refunds by subtracting therefrom an amount equal to the prior year's excess profits taxes allocable thereto, it chose to reach the same result by the more general terms of (i) (3) and section 3806. But he is unable to point

---

[4] These provisions are as follows:

(D) Notwithstanding any of the provisions of subsection (c) (4) of this section to the contrary, in the case of a renegotiation which is made prior to such recomputation, there shall be repaid by the United States (without interest) to the contractor or subcontractor after such recomputation the amount of a net renegotiation rebate computed in the following described manner. There shall first be ascertained the portion of the excessive profits determined by the renegotiation which is attributable to the fiscal year with respect to which a net renegotiation rebate is claimed by the contractor or subcontractor (hereinafter referred to as "renegotiated year"). There shall then be ascertained the amount of the gross renegotiation rebate for the renegotiated year, which amount shall be an allocable part of the additional amortization deduction which is allowed for the renegotiated year upon the recomputation made pursuant to section 124 (d) of the Internal Revenue Code in connection with the determination of the taxes for such year and which is attributable to contracts with the Departments and subcontracts, except that the amount of the gross renegotiation rebate shall not exceed the amount of excessive profits eliminated for the renegotiated year pursuant to the renegotiation. The allocation of the additional amortization deduction attributable to contracts with the Departments and subcontracts, and the allocation of the additional amortization deduction to the renegotiated year shall be determined in accordance with regulations prescribed by the Board. There shall then be ascertained the amount of the contractor's or subcontractor's Federal tax benefit from the renegotiation for the renegotiated year. Such Federal tax benefit shall be the amount by which the taxes for the renegotiated year under Chapters 1, 2A, 2B, 2D, and 2E of the Internal Revenue Code were decreased by reason of omitting from gross income (or by reason of the application of the provisions of section 3806 (a) of the Internal Revenue Code with respect to) that portion of the excessive profits for the renegotiated year which is equal to the amount of the gross renegotiation rebate. The amount by which the gross renegotiation rebate for the renegotiated year exceeds the amount of the contractor's or subcontractor's Federal tax benefit from the renegotiation for such year shall be the amount of the net renegotiation rebate for such year.

to anything suggesting that Congress intended its silence to be interpreted as authorizing a redetermination of excessive profits under section 3806 for the purpose of assessing a deficiency, once the amount of excessive profits has been determined and section 3806 has played its part, as was the case here in 1943. To be sure, he cogently states that it is difficult to see why Congress would require such disparity of treatment as is accorded to the two different types of refunds. But the blunt fact is that Congress has treated these types of refunds differently.

Moreover, we think that the provisions of (i) (3) and section 3806 do not lend themselves to the result which respondent seeks to reach. He points out that under (i) (3) it is provided that "there shall be excluded from consideration in determining whether or not a contractor * * * has received * * * excessive profits that portion of the profits * * * attributable to the increment in value of the excess inventory," and argues that any refund based thereon reduces "excessive profits eliminated" under section 3806 (a), so that a deficiency for the earlier year would come into being in the later year by reason of the contractor's having received too great a tax credit under section 3806 (b). Cf. *Baltimore Foundry & Machine Corp.*, 7 T. C. 998; *Stow Manufacturing Co.*, 14 T. C. 1440. But petitioner's right to a refund first came into being in 1944, upon the enactment of the Revenue Act of 1943, and the quoted portion of (i) (3) plainly looks merely to the determination of excessive profits in renegotiation cases that are still under consideration. It is only the last sentence in (i) (3) that deals with refunds for fiscal years ending prior to July 1, 1943, and there is nothing in (i) (3) that contemplates a recalculation under section 3806 in such cases. Section 3806 established the machinery for reducing the amount of excess profits taxes for the renegotiated year. Unlike the situation in *National Builders, Inc.*, 12 T. C. 852, where the renegotiation proceedings had not yet proceeded to a conclusion, the amount of excessive profits here had been determined with finality in 1943, and section 3806 correctly served its purpose in 1943 with respect to the year 1942, in accordance with the then applicable law. Its function has been fully discharged, and (i) (3) was not intended to bring it back into play in order to increase petitioner's taxable income for 1942.

Reviewed by the Court.

*Decision will be entered under Rule 50.*